1

2

3

4

5

6

7                    IN THE UNITED STATES DISTRICT COURT

8                FOR THE EASTERN DISTRICT OF CALIFORNIA

9   TERRY BROWN,

10              Petitioner,                    No. 2:06-cv-02455 ALA (HC)

11         vs.

12   MICHAEL MARTEL, Warden[1]

13              Respondent.                    <u>ORDER</u>

14   _____/

15         Pending before the Court are Terry Brown's ("Petitioner") application for a writ of

16   habeas corpus pursuant to 28 U.S.C. § 2254(a) (doc. 1), Respondent's Answer (doc. 5), and

17   Petitioner's Reply, which he labeled a "Traverse" (doc. 7).  Also before the Court are the parties'

18   briefs filed in response to this Court's December 18, 2007 order requesting additional briefing on

19   the applicability of *Irons v. Carey*, 479 F.3d 658 (9th Cir. 2007) to this matter.  For the reasons

20   discussed below, Petitioner's application is denied.

21                                    **I**

22                                    **A**

23         On September 14, 1978, the San Bernardino County Superior Court found Petitioner

24   _____

25         [1]Michael Martel is substituted for his predecessor, Rosanne Campbell, as the warden
     where the prisoner is incarcerated, pursuant to Rule 25(d) of the Federal Rules of Civil
26   Procedure.

guilty of the following crimes: (1) first degree murder, in violation of California Penal Code §

187; (2) kidnaping for robbery, in violation of California Penal Code § 209; and (3) robbery, in

violation of California Penal Code § 211.  He was sentenced to 7 years to life.

**B**

Both parties agree to the Respondent's description of the crime:

> Brown was 24 years old and on parole at the time of the
> commission of the crime.  Brown, his younger brother Roger and
> crime partner Scott McLaughlin decided to rob a local gas station
> where Brown had previously worked.  The victim, Terry Shipley,
> was 18 years old and a stranger to Brown.  Shipley was working
> alone when Brown entered the station, overpowered him and
> forced him into a car.  Brown bound Shipley's hands with
> pantyhose and drove him to a remote location while his crime
> partners stayed behind.  At the remote location, Shipley was made
> to kneel in the dirt.  Brown then executed him with a single, close
> range shot to the head using a sawed-off shotgun.  Brown then
> took the keys from Shipley and drove back to the gas station where
> he and his two crime partners took cigarettes, cash and motor oil
> before fleeing.  Shipley's body was discovered the next day.

Answer 2.

**C**

On April 13, 2005, the California Board of Prison Terms ("BPT") determined that

Petitioner was suitable for parole, and that he "would not pose an unreasonable risk of danger to

others or a threat to public safety if released from prison."  BPT April 2005 Decision at 52.  On

September 9, 2005, Governor Arnold Schwarzenegger reversed the grant of parole because

"based upon the gravity of the first-degree murder he committed [the Governor] continue[d] to

believe Mr. Brown would pose an unreasonable risk of danger to society if paroled at this time."

The Governor's decision reads as follows:

> On February 26, 1978, Terry Brown, his younger brother Roger,
> and Scott McLaughlin decided to rob a gas station.  They drove to
> a Rocket gas station where Mr. Brown had worked previously.
> Terry Shipley, an 18-year-old stranger to Mr. Brown, was working
> alone in the station when Mr. Brown entered.  Mr. Shipley was
> immediately overpowered and forced by Mr. Brown into the car.
> Mr. Brown bound Mr. Shipley's hands with pantyhose and drove
> him to a remote location.  Mr. McLaughlin and Roger stayed

behind at the station.

Once at the remote location, Mr. Shipley was made to kneel in the dirt and Mr. Brown executed him with a singe, close-range shot to the head using a sawed-off shotgun. Mr. Brown took Mr. Shipley's keys afterwards and returned to the gas station. Mr. Brown, Mr. McLaughlin, and Roger then took cigarettes, cash, and motor oil from the station before fleeing together. Mr. Shipley's dead body was discovered the next day.

Mr. Brown was 24 years old and on parole when he murdered Mr. Shipley. A search of his residence by his parole agent revealed crime-scene evidence, and Roger and Mr. McLaughlin, who lived with Mr. Brown and were present during the search, were arrested. Mr. Brown was not in the residence at the time but turned himself in about a week later, claiming he was only involved in receiving stolen property - and denying any involvement in the murder. Despite his denials, a jury found Mr. Brown guilty of first-degree murder with the use of a firearm, kidnap for robbery, and robbery. He was sentenced to seven years to life in prison for the murder plus a two year enhancement for using a firearm. For the kidnaping for robbery, he received an additional life term plus a three-year enhancement for inflicting substantial physical injury. He was sentenced to four years in prison for the robbery plus a one-year deadly-weapon enhancement and a three-year enhancement for inflicting substantial physical injury. All sentences were ordered by the court to run concurrently.

When I reversed the Board's 2002 decision last year to grant Mr. Brown parole, I noted that the senseless murder of Mr. Shipley was not Mr. Brown's first run-in with crime. At approximately age 16, he drove on to school grounds and attempted to run down a student against whom he had a grudge. According to the probation officer's report, he was also charged as a juvenile in multiple instances of burglary, joyriding, and receiving stolen property, and he spent time on probation and in juvenile hall. In 1972, he escaped from juvenile hall and was at-large for nine months. According to information in the probation officer's report, Mr. Brown and his brother were the most sophisticated criminals the officer had seen on juvenile probation.

As an adult, Mr. Brown was convicted of attempted petty theft, receiving stolen property, marijuana possession, and misdemeanor DUI. In fact, he served a prior prison term for the stolen property and marijuana possession convictions - and had been on parole for these offenses for just 14 months when he murdered Mr. Shipley. Once incarcerated for Mr. Shipley's murder, Mr. Brown's disregard for authority and rules continued. Not only was he disciplined several times for serious prison-rules violations, but in 1978 he escaped from prison and was at-large for two weeks.

Although Mr. Brown continued to deny for 10 years after Mr. Shipley's murder that he was responsible for the killing, he does now acknowledge his guilt.  He has consistently maintained that he was drinking alcohol and using PCP on the day of the murder and has also claimed, including most recently to the Board at his last parole hearing, that there was a third crime partner, in addition to Mr. McLaughlin and Roger, who entered the gas station with him that night.  While Mr. Brown says this other crime partner helped him force Mr. Shipley into the car and helped tie him up and take him to the remote location, Mr. Brown admits that he was the one who shot Mr. Shipley.

Mr. Brown says he is sorry for what he did and has made some gains during his 27-year prison stay.  In addition to remaining discipline-free since 1981, he earned his GED in 1981 and became certified as an X-ray technician in the early 1990s.  He has also acquired skills in jewelry making and carpentry and has received commendations from prison staff as well as positive work reports for his performance in various prison assignments.  Mr. Brown also acknowledges his long substance-abuse history, involving extensive use of alcohol as well as marijuana and PCP, and seems to have gained control over it within an institutional setting.  He has participated in Alcoholics Anonymous since the late 1980s and in Narcotics anonymous, in addition to other self-help and therapy such as Stress Management, Victims/Offenders Learning Together, Rational Recovery, Framework for Recovery, Pathway program, Category X, Criminals and Gang Members Anonymous, and Breaking Barriers.  He has maintained relationships with various family members and others via letters and visits and has seemingly established a strong support system for himself.  Mr. Brown has enhanced his ability to function within the law upon release from prison.

Moreover, Mr. Brown has made some plans for parole to live with his wife or at a halfway house in San Joaquin County and work as a handyman for family members.  He told the Board that he intends to look for more long-term work in X-ray technology once he is released, and according to documentation in his prison file from the California Department of Health Services, his certification in this field is currently valid through March 2006.

But despite the positive factors presently tending to support Mr. Brown's release from prison to parole, he committed, as I stated in my decision last year, an especially horrific and inexplicable murder.  Mr. Shipley, an 18 year old working alone at night, was particularly vulnerable; he was outnumbered and overpowered by these men, bound, and abducted.  He then was shot by Mr. Brown through the head at close-range.  There was no reason for this killing, which even Mr. Brown at his 2002 and 2004 hearings described as "senseless."  Mr. Brown, who worked at the station previously and knew the logistics, could have robbed the station

4

1     with his crime partners and left.  Likewise, even after driving Mr.
      Shipley to the remote location, Mr. Brown could have just
2     abandoned him there.  Instead he chose to shoot Mr. Shipley
      through the head.  This was a calculated, dispassionate execution.
3     And the manner in which it was committed demonstrates a
      shocking degree of viciousness beyond the minimum necessary for
4     a first-degree murder.  Mr. Brown was sentenced under old
      sentencing laws and received seven years to life in prison; he could
5     have received a death sentence.

6     The San Bernardino County Sheriff's Department and the San
      Bernardino County District Attorney's Office have repeatedly
7     opposed Mr. Brown's parole.  The Sheriff's Department has
      written letters on at least 14 separate occasions, most recently in
8     2004 and 2005, each time underscoring the ghastly crime Mr.
      Brown committed.  And the District Attorney's Office has
9     weighed in at least seven times, citing at Mr. Brown's most recent
      hearing the gravity of the murder he committed and his criminal
10    record.

11    Mr. Brown has been in prison a long time and has made some
      creditable gains during this time.  Nevertheless, after carefully
12    considering the very same factors that the Board must consider,
      based on the gravity of the first-degree murder he committed I
13    continue to believe Mr. Brown would pose an unreasonable risk of
      danger to society if paroled at this time.  Accordingly, I REVERSE
14    the Board's 2005 decision to grant parole to Mr. Brown.

15        Petitioner filed a state petition for a writ of habeas corpus before the San Bernardino

16  County Superior Court challenging the Governor's September 9, 2005 decision.  The San

17  Bernardino County Superior Court denied his petition on June 29, 2006.

18        The San Bernardino County Superior Court's order reads as follows:

19    The court has received, read and considered the Petition for Writ
      of Habeas Corpus filed on March 23, 2006; the Informal Response
20    filed by the Respondent on June 7, 2006; and the Informal Reply
      filed by the Petitioner on June 20, 2006.
21
      This Petitioner filed a previous Petition to set aside the then
22    Governor's reversal of the Board of Prison Terms decision
      granting him parole.  The Petition was granted and the matter was
23    remanded back to the Governor to include in his decision of
      reversal certain required findings.
24
      In 2005, the Petitioner was again granted parole at the hearing held
25    on April 13, 2005 before the Board of Parole Hearings [sic].  That
      decision was again reversed by the present Governor under the
26    authority of the California Constitution, Article V, Section 8,

5

Subdivision (b) and Penal Code § 3041.2(b).  A written statement was provided by the Governor setting forth the reasons for the reversal.

The last and most definitive word in the area of law controlling judicial review of the Governor's reversal of a Board of Parole Hearings to grant parole was made by the California Supreme Court in *In re Rosenkrantz* 29 Cal 4th 616.

The Governor in reversing a decision of the now Board of Prison's hearings granting parole must consider the exact record relied on by the Board in its decision but it is sufficient if the Governor states that he has considered all factors used by the Board and the Governor need not specify or specifically refer to the factors considered.  *In re Morrall* 102 CA 4 280; *In re Arafies* 6 CA 4 1467.

The Petitioner contends in his Petition that the Governor erred in reversing the Board's decision granting parole and that, in fact there was no evidence to support the Governor's decision to reverse the granted parole on the basis that the Petitioner would pose an unreasonable risk of danger to public safety due to the circumstances of the crime.  He also contends that the Governor's reliance on the unchanging factors of Petitioner's crime and his history of prior criminality to conclude that he poses a public safety threat was an error and violates the Petitioner's due process rights.  A review of the statement of the Governor indicating the basis upon which he reversed the decision of the Board to grant parole and finding that the Petitioner continued to be an unreasonable risk of danger to society if released, indicates that the Governor relied heavily on the circumstances of the crime and what the Governor considered to be a senseless murder of a Mr. Shipley, which the Governor found was not the Petitioner's first run-in with crime.  The Governor also relied upon the fact of Mr. Brown's age of twenty-four years and that he was on parole when he murdered Mr. Shipley.

The Governor further considered the positive factors presently tending to support the Petitioner's release from prison to parole. But as he stated in his decision of reversal of a Board decision in granting parole the previous year, Mr. Brown was guilty of an especially horrific and inexplicable murder.  This court will add that the killing of the victim was an execution style killing as defined in California Code of Regulations, Title 15, Section 2402(c)(1)(B) and stated as a factor of unsuitability.

Penal Code § 3041(b) provides for parole review of inmates such as Petitioner and further provides that inmates shall be given a release date unless the Board determines that the gravity of the current convicted offense is such that consideration of the public safety requires a more lengthy period of incarceration.  California

Code of Regulations, Title 15, Section 2402(a)-(d) sets forth the rules by which the Board and the Governor are to make their determination.  As stated by the court in *In re Dannenberg* 34 Cal. 4th 1061, parole applicants have an expectation of being granted parole unless the Board and the Governor find in the exercise of their discretion that the applicant is unsuitable.  The operative words are "in the exercise of their discretion."  Judicial review of this discretion is limited only to a determination of whether there is "some evidence" in the record to support the decision.  As held by the High Court, this standard of "some evidence" is extremely deferential.

The reviewing Court is prohibited from conducting and [sic] independent assessment of merits and considering whether substantial evidence supports the findings of the Board and the Governor in his reversal of the Board's underlying decision.  The Board is required to consider the Petitioner's background, his institutional participation, post-parole plans, as well as the psychological evaluations.  The Governor is controlled by the same criteria.  The High Court has held, however, that the nature of the inmate's offense, *alone*, could constitute a sufficient basis for denying parole.  This does not permit the parole authority including the Governor, to automatically exclude parole for individuals who have been convicted of a particular type of offense.

A review of the record before the Board and that viewed by the Governor in his reversal, supports a finding that there was "some evidence" which led the Governor to a reversal of the Board's granting of parole, for as the High Court describes such evidence, it need be only a "modicum" of evidence.

It is plain and the Governor stated it in his letter of reversal that the primary basis for the finding of the Petitioner being unsuitable for parole and that he would impose an unreasonable risk or threat to society was the circumstances of the committed offense and his previous involvement with law enforcement.

The Governor concluded in his statement of reversal with the paragraph that states "Mr. Brown has been in prison a long time and has made some credible gains during this time.  Nevertheless, after carefully considering the very same factors that the Board must consider, based on the gravity of the first degree murder he committed I continue to believe Mr. Brown would pose an unreasonable risk of danger to society if paroled at this time."

The court finds that there is more than "some evidence" to support the Governor's conclusion.

As to his second contention the Petitioner asserts that even if the murder was committed in a particularly egregious manner, which it

1    was in this courts opinion and in the Governor's decision, this is
     not a ground for continual denial of parole.  He relies upon *Biggs*
2    *v. Terhune* (9th Circuit, 2003) 334 F.3[d] 910.  Although Mr.
     Biggs was denied parole because of the gravity of the offense, the
3    Ninth Circuit of Appeals found this acceptable by stated that
     should Mr. Biggs continue to be otherwise found suitable and
4    denied simply because of the nature of his crime, such would
     violate his "liberty interest on parole" and result in a due process
5    violation.  *Biggs*, *Supra*, at page 911, 917.

6    The *Biggs* court was deciding on the merits of the case before it
     and therefore the holding is not a clear statement of constitutional
7    law which this court would be required to follow.  *People v.*
     *Camacho* 23 Cal. 4th 824.  The statement of the *Biggs* court is
8    classed as dictum.

9    The California Supreme Court has not chosen to hold as did the
     *Biggs* court, and, as far as this court is concerned he has not
10   demonstrated that he has suffered a denial of due process.

11   The Petition for Writ of Habeas Corpus is denied.

12       Petitioner filed a petition for a writ of habeas corpus before the California Court of

13   Appeal for the Fourth Appellate District.  That court summarily denied the petition on July 27,

14   2006.  Petitioner then filed a petition for review before the California Supreme Court.  That court

15   summarily denied the petition for review on October 18, 2006.  Petitioner filed an application for

16   a writ of habeas corpus in this Court pursuant to 28 U.S.C. § 2254(a) on November 6, 2006.

17                                              **II**

18       Before this Court, Petitioner contends that he is entitled to habeas relief.  He alleges that

19   the Governor violated his federal constitutional rights under the Eighth and Fourteenth

20   Amendments because the Governor did not base his decision on some evidence demonstrating

21   that he was unsuitable for release on parole.

22       An application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254(a) "shall not be

23   granted with respect to any claim that was adjudicated on the merits" in state court unless the

24   adjudication of the claim:

25       (1)    resulted in a decision that was contrary to, or involved an
                 unreasonable application of, clearly established Federal
26               law, as determined by the Supreme Court of the United

8

1    States; or

2    (2)    resulted in a decision that was based on an unreasonable
            determination of the facts in light of the evidence
3            presented in the State court proceeding.

4    28 U.S.C. § 2254(d).

5                                        **A**

6        Challenges to parole denials are construed as procedural due process claims.  "'A

7    procedural due process claim has two distinct elements: (1) a deprivation of a constitutionally

8    protected liberty or property interest, and (2) a denial of adequate procedural protections.'"

9    *McQuillion v. Duncan*, 306 F.3d 895, 900 (9th Cir. 2002) (quoting *Brewster v. Bd. of Educ. of*

10   *Lynwood Unified Sch. Dist.*, 149 F.3d 971, 982 (9th Cir. 1998)).

11                                       **B**

12       Citing Ninth Circuit authority, Petitioner contends that he is entitled to relief because a

13   California prisoner has a liberty interest in being released on parole protected by the Due Process

14   Clause of the Fourteenth Amendment.  In his answer, Respondent maintains that no decision of

15   the United States Supreme Court has held that a state prisoner has a federally protected interest

16   in release on parole.  The Ninth Circuit has held that "California's parole scheme gives rise to a

17   cognizable liberty interest in release on parole."  *Sass v. Cal. Bd. of Prison Terms*, 461 F.3d,

18   1123, 1127-28 (9th Cir. 2006).  This Court is bound by that conclusion.  *See Zuniga v. United*

19   *Can Co.*, 812 F.2d 443, 450 (9th Cir. 1987) (citation omitted) ("District courts are, of course,

20   bound by the law of their own circuit, and 'are not to resolve splits between circuits no matter

21   how egregiously in error they may feel their own circuit to be.'").

22                                       **C**

23       In *Superintendent v. Hill*, 472 U.S. 445, 454 (1985), the Supreme Court held that

24   "revocation of good time does not comport with 'the minimum requirements of procedural due

25   process,' unless the findings of the prison disciplinary board are supported by 'some evidence' in

26   the record."  (Citation omitted).  The Ninth Circuit has held that *Hill*'s some evidence standard

1   applies to parole release proceedings.  *Sass*, 461 F.3d at 1128-29; *see Irons v. Carey*, 505 F.3d

2   846, 851 (9th Cir. 2007) ("the Supreme Court ha[s] clearly established that a parole board's

3   decision deprives a prisoner of due process with respect to this interest if the board's decision is

4   not supported by 'some evidence in the record,' . . . or is 'otherwise arbitrary'").  In his response

5   to this Court's December 18, 2007 Order for supplemental briefing regarding the applicability, if

6   any, of *Irons* to this matter, Respondent argues that because the Supreme Court has never

7   applied the some evidence test to a parole decision, this Court is not required to follow *Irons*.

8   This Court must apply the Ninth Circuit's holding in *Sass* and *Irons* that the some evidence

9   standard applies in parole release decisions.  *See Zuniga*, 812 F.2d at 450.  Therefore, the

10  question before the Court is whether the Governor's decision to reverse the BPT was supported

11  by some evidence.

12         Petitioner argues that the Governor's decision was not supported by some evidence

13  because it was based solely on the nature of Petitioner's commitment offense and his criminal

14  history.  He claims that *Irons*, 479 F.3d 658 (9th Cir. 2007), stands for the proposition that a due

15  process violation will result if parole is denied based on "an immutable factor such as the

16  commitment offense."  Pet'r Br. Resp. Ct. Order 2.  He alleges that *Irons* did not grant habeas

17  relief despite the due process violation because the petitioner in that case had "not yet served the

18  minimum time required for the offense."  The Ninth Circuit's decision in *Irons* does not support

19  this proposition.

20         In *Irons*, the Ninth Circuit held that:

21              where, as here, there is some evidence to support a finding that
                "the offense was carried out in a manner which demonstrates an
22              exceptionally callous disregard for human suffering" and the
                "motive for the crime is inexplicable or very trivial in relation to
23              the offense," Cal. Code Regs., tit. 15 § 2402(c)(1)(D)-(E), we
                cannot say that the state court unreasonably applied *Hill*'s "some
24              evidence" principle.

25  *Irons*, 505 F.3d at 853.  In *Irons*, the record showed that the BPT relied on the commitment

26  offense in determining that the prisoner was unsuitable for release on parole.  *Id.* at 852.

1    The Ninth Circuit limited its holding in *Irons* as follows: "All we held in [*Sass*, 461 F.3d

2    at 1125 and *Biggs v. Terhune*, 334 F.3d 910, 912 (9th Cir. 2002)] and all we hold today,

3    therefore, is that, given the particular circumstances of the offenses of these cases, due process

4    was not violated when these prisoners were deemed unsuitable for parole prior to the expiration

5    of their minimum terms." *Irons*, 505 F.3d at 853-54.  In an unusual comment in *Irons*, the panel

6    expressed its aspiration that some future court decision will conclude that the BPT has the duty

7    to grant parole where "there was substantial evidence in the record demonstrating rehabilitation."

8    *Id.* at 854.

9        The Court stated:

10           We hope that the Board will come to recognize that in some cases,
             indefinite detention based solely on an inmate's commitment
11           offense, regardless of the extent of his rehabilitation, will at some
             point violate due process, given the liberty interest in parole that
12           flows from the relevant California statutes.

13   *Id.*

14       The *Irons* panel did not cite any authority to support its prognostication that a state

15   court's denial of habeas corpus relief, under such circumstances, would be "contrary to, or

16   involve[] an unreasonable application of clearly established Federal law, as determined by the

17   Supreme Court of the United States" in violation of 28 U.S.C. § 2254(d)(1).  No presently

18   binding Ninth Circuit decision has fulfilled the prediction of the *Irons*'s panel.

19       In the precedential portion of the *Irons* decision, the court held that "we must look to

20   California law to determine the findings that are necessary to deem a prisoner unsuitable for

21   parole, and then must review the record in order to determine whether the state court decision

22   holding that these findings were supported by 'some evidence' . . . constituted an unreasonable

23   application of the 'some evidence' principle articulated in *Hill*, 472 U.S. at 454." *Irons*, 505 F.3d

24   at 851.  A prisoner's commitment offense, on its own, may justify parole denial if "the Board

25   can 'point to factors beyond the minimum elements of the crime for which the inmate was

26   committed' that demonstrate the inmate will, at the time of the suitability hearing, present a

11

danger to society if released." *Id.* at 852 (quoting *Dannenberg*, 34 Cal. 4th 1061,1071 (2005)). An offense committed in an especially heinous, atrocious or cruel manner is a factor tending to show unsuitability for release.  Cal. Code. Regs., tit. 15 § 2402(c)(1).

Contrary to Petitioner's argument, the BPT and the Governor may rely on unchanging factors to find that an inmate is unsuitable for parole.  Therefore, this Court turns to the question whether some evidence supported the Governor's September 9, 2005 decision to deny parole to the Petitioner.

### III

### A

As a preliminary matter, the Court will address Petitioner's allegation that the Governor's procedure in denying him a parole release date violates his federal due process rights.  Petitioner alleges that "[t]he Governor's burden of proof is substantial insofar as he must, like a reviewing court, presume that the Board found the correct facts and made the correct decision.  The Governor can overcome that presumption only if he finds clear error."  Pet'r State Mem. Supp. Pet. 10.  This contention is unmeritorious.  Pursuant to California law, the Governor's decision must be supported by some evidence.  The Governor applies the same factors the BPT applies in determining whether to "affirm, modify, or reverse a Board order granting or denying parole on a murder sentence."  Cal. Const. art. V, § 8.; *In re Dannenberg*, 34 Cal. 4th 1061, 1086 (2005). For this reason, the Court reviews the Governor's decision according to the principles applicable to cases in which the BPT has denied parole.

### B

Petitioner contends his federal due process rights were violated, and that he is entitled to be released on parole, because there is no evidence to support the Governor's decision that he would pose an unreasonable risk to public safety if released from prison.

As discussed above, pursuant to *Irons*, "we must look to California law to determine the

1    findings that are necessary to deem a prisoner unsuitable for parole, and then must review the

2    record in order to determine whether the state court decision holding that these findings were

3    supported by 'some evidence' . . . constituted an unreasonable application of the 'some

4    evidence' principle articulated in *Hill*, 472 U.S. at 454." *Irons*, 505 F.3d at 851.  A prisoner's

5    commitment offense, on its own, justifies parole denial if "the Board can 'point to factors

6    beyond the minimum elements of the crime for which the inmate was committed' that

7    demonstrate the inmate will, at the time of the suitability hearing, present a danger to society if

8    released." *Id.* at 852 (quoting *Dannenberg*, 34 Cal. 4th 1061,1071 (2005)).  Thus, pursuant to

9    *Irons,* the Governor may rely on unchanging factors to find that an inmate is unsuitable for

10   parole.

11          Section 3041(b) provides that the BPT

12               "shall set a release date unless it determines the gravity of the
                 offense or offenses, or the timing and gravity of current or past
13               convicted offense or offenses, is such that consideration of the
                 public safety requires a more lengthy period of incarceration for
14               this individual, and that a parole date, therefore, cannot be fixed at
                 this meeting."

15
16          Section 2402 of the California Code of Regulations sets forth the circumstances that tend

17   to show unsuitability for parole release.  Section 2402(c)(1) provides the nature of a commitment

18   offense may justify denial if the "prisoner committed the offense in an especially heinous,

     atrocious or cruel manner."

19
20          The factors to be considered include:

21          (A) Multiple victims were attacked, injured or killed in the same or
            separate incidents.
22          (B) The offense was carried out in a dispassionate and calculated
            manner, such as an execution-style murder.
23          (C) The victim was abused, defiled or mutilated during or after the
            offense.
24          (D) The offense was carried out in a manner which demonstrates
            an exceptionally callous disregard for human suffering.
25          (E) The motive for the crime is inexplicable or very trivial in
            relation to the offense.

26          The Governor's findings are sufficient to demonstrate that  Petitioner is unsuitable for

13

1    parole pursuant to Cal. Pen. Code § 3041(b) and Cal. Code Regs. tit. 15, § 2402.  The Governor

2    reversed the BPT's decision to set a release date because he found that "Mr. Brown would pose

3    an unreasonable risk of danger to society paroled at this time."  Governor's Decision 3.  His

4    decision relied heavily on the gravity of the murder.  Petitioner's offense was an execution style

5    murder, which is identified as an example of an offense that "was carried out in a dispassionate

6    and calculated manner."  § 2402(c)(1)(B).  The Governor noted that "the manner in which it was

7    committed demonstrates a shocking degree of viciousness beyond the minimum necessary for a

8    first-degree murder."  Governor's Decision 3.  Therefore, the Governor's finding that

9    Petitioner's crime was carried out in an especially heinous, atrocious or cruel manner is

10   supported by some evidence.

11          Petitioner alleges that the Governor's decision regarding factors other than the

12   commitment offense, relied on evidence not supported by the record.  This Court need not reach

13   this issue, because the Governor's reliance on the commitment offense is sufficient to satisfy the

14   some evidence standard.

15          The record shows that the Governor considered the circumstances set forth in § 2402(d)

16   that tend to show suitability for parole release including the facts that Petitioner had not been

17   charged with a disciplinary infraction since 1981, and that his progress in prison had improved.

18   The Governor commended him for obtaining a GED and his success in vocational programs.

19   The Governor concluded, however, that "despite the positive factors presently tending to support

20   Mr. Brown's release from prison to parole, he committed . . . an especially horrific and

21   inexplicable murder."   "To determine whether the some evidence standard is met 'does not

22   require examination of the entire record, independent assessment of the credibility of witnesses,

23   or weighing of the evidence.  Instead, the relevant test is whether there is any evidence in the

24   record that could support the conclusion reached by the disciplinary board.'"  *Sass*, 461 F.3d at

25   1128 (quoting *Hill,* 472 U.S. at 455-56).  "Hill's some evidence standard is minimal, and assures

26   that 'the record is not so devoid of evidence that the findings of the disciplinary board were

14

1   without support or otherwise arbitrary.'" *Id.* at 1129 (quoting *Hill,* 472 U.S. at 457).

2                                                        **Conclusion**

3         The Governor's finding that Petitioner is unsuitable for release on parole because he

4   poses an unreasonable risk to public safety was supported by some evidence that outweighed the

5   suitability factors based on his performance while imprisoned.  Therefore, the state court's denial

6   of his petition for habeas corpus was not "contrary to, or involved an unreasonable application

7   of, clearly established federal law, as determined by the Supreme Court of the United States."

8   28 U.S.C. § 2254(d).

9         It is therefore hereby ORDERED that Petitioner's application for habeas corpus relief is

10   DENIED.

11   */////*

12   DATED: July 2, 2008

13                           /s/ Arthur L. Alarcón

14                           ————————————————————
                                     UNITED STATES CIRCUIT JUDGE

15                                      Sitting by Designation

16

17

18

19

20

21

22

23

24

25

26